GEOFFREY S. BERMAN
United States Attorney for
the Southern District of New York
By:    KIERSTEN A. FLETCHER
       JONATHAN E. REBOLD
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2238/2512

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
                                     :
UNITED STATES OF AMERICA             :
                                     :    **VERIFIED COMPLAINT**
        v.                           :    **FOR FORFEITURE**
                                     :
$96,900.00 IN UNITED STATES CURRENCY,:
                                     :
                Defendant-*in-rem*.  :    18 Civ. _____
                                     :
                                     :
                                     :
------------------------------------ x

Plaintiff United States of America, by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

### JURISDICTION AND VENUE

1.     This is a civil action in rem is commenced by the United States of America pursuant to Title 18, United States Code, Section 981 seeking the forfeiture of $96,000.00 in United States currency seized on or about September 14, 2017 ("Defendant-*in-rem*" or "Defendant Currency").

1

2. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

3. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

## PROBABLE CAUSE FOR FORFEITURE

Background to the Investigation

4. Since around 2016 the Drug Enforcement Administration ("DEA") has been involved in an investigation (the "DEA Investigation") into a money laundering organization that launders drug proceeds on behalf of narcotics traffickers, and that operates in California and New York – including Manhattan – among other places (the "MLO").

5. Prior to September 2017, the DEA Investigation led to the identification of various members and associates of the MLO, including the MLO's leader ("CC-1"), who among other things, instructs MLO members to receive large quantities of cash, related to narcotics transactions – frequently between $100,00 to $200,000 – at various locations in the United States; count the cash; transport and provide the cash to other members of the MLO; and transfer the cash to specific bank accounts. The instant complaint relates to the September 14, 2017 seizure by the DEA from another identified member of the MLO ("CC-3") of approximately $96,900 (i.e. the Defendant Currency).

September 14, 2017 Seizure

6. In connection with the DEA Investigation, on September 14, 2017, DEA agents conducted surveillance of CC-1, who, at around 2:45 p.m., was observed entering the front passenger seat of a particular car (Car-1) that was parked at a location in Brooklyn, and was being operated by another previously identified member of the MLO ("CC-2"). DEA agents surveilled Car-1 as it travelled from Brooklyn to a particular location in Manhattan, whereupon DEA agents observed CC-1 get out of Car-1 and enter a restaurant (the "Restaurant"). Meanwhile, CC-2 parked Car-1 at a nearby location. Thereafter, CC-2 also entered the Restaurant.

7. Around 20 minutes later, CC-1 and CC-2 emerged from the Restaurant with an unidentified female ("UF-1"). Shortly thereafter, UF-1 and an unidentified male walked towards and into a nearby building ("Building-1"). In the meantime, CC-1 waited directly in front of Building-1 while CC-2 retrieved Car-1. Shortly after 4:00 p.m., UF-1 emerged from Building-1 carrying a heavily-weighted white paper shopping bag (the "Bag"). As UF-1 was leaving Building-1, UF-1 looked to the left and the right in a manner that, based on the surveilling DEA Agents' training and experience, was consistent with conducting a counter-surveillance technique to see if there were law-enforcement agents in the area. Upon leaving Building-1, UF-1 and CC-1 walked to Car-1, which was now parked several feet away. UF-1 placed the Bag in the trunk of Car-1. UF-1 and CC-1 entered Car-1, which travelled to a building in Manhattan where CC-1 resides ("CC-1's Residence"). At some point on the way to CC-1's Residence, Car-1 inexplicably stopped for five minutes and then continued driving. Based on their training and experience, the DEA Agents believe this was done as a counter-surveillance measure to determine if Car-1 was being followed by law enforcement.

8. At around 4:20 p.m., CC-1 exited Car-1 and walked to the trunk of Car-1, whereupon CC-1 looked to the left and right – which based on the agents' training appeared to be a counter-surveillance measure – before retrieving the Bag from the trunk. CC-1 then walked directly into CC-1's Residence, bag in hand, while CC-2 drove off in Car-1. Some DEA Agents remained on scene to surveil CC-1's Residence while other DEA Agents conducted surveillance of Car-1.

9. The DEA Agents that pursued Car-1 observed Car-1 travel to Brooklyn. During this surveillance, the agents observed that Car-1 made numerous seemingly nonsensical lane changes and frequently accelerated and decelerated. The agents also observed CC-2 twice look directly into the DEA's surveilling vehicle, and it appeared to the agents that CC-2 believed that CC-2 was being followed by law enforcement. At one point during the surveillance, Car-1 pulled into the parking lot of a bank ("Bank-1") for approximately one minute, before travelling further into Brooklyn. Thereafter, attempts to maintain surveillance of Car-1 were unsuccessful. Based on their observations, training, and experience, the surveilling agents believed that CC-2's erratic driving, and decision to temporarily pull into Bank-1's parking lot, was a counter-surveillance technique by CC-2 to determine if CC-2 was being surveilled by law enforcement.

10. At around 6:20 p.m., the DEA agents conducting surveillance of CC-1's Residence observed an individual, later identified CC-3, approach CC-1's Residence and place a phone call (the "Call"). Toll records for a phone number belonging to CC-1 ("CC-1's Phone") confirm that, at this time, a call was placed to CC-1's from a phone number attributable to CC-3 (as described in further detail below) ("CC-3's Phone Number"). About three minutes later, an unidentified Asian female ("UF-2") emerged from CC-1's Residence with a white United States Postal Service Priority Mail box (the "Box"). UF-2 handed the Box to CC-3, who walked to a

car parked nearby ("Car-2"), whereupon CC-3 Placed the Box in a concealed compartment in the rear cargo area of Car-2 (the "Compartment").

11. As CC-3 entered Car-2, a DEA agent ("Agent-1") approached and identified himself to CC-3 as a law enforcement officer. Agent-1 asked CC-3 about his itinerary and the Box CC-3 placed in Car-2. CC-3 stated to Agent-1 in substance and in part that CC-3 left CC-3's residence in Flushing, New York, 90 minutes earlier to sight-see in New York, and that CC-3 was on his way back to Flushing, New York. Agent-1 again asked CC-3 about the Box, whereupon CC-3 stated, in substance and in part, that CC-3 owns a shipping company named "Xing Xing Express," and that CC-3's friend "Mike" called CC-3 and asked CC-3 to ship a box containing baby items to China.[1] During that call, "Mike" instructed CC-3 to meet a female around the corner of "Mike's" building, so that the female could provide CC-3 with the box of baby items. CC-3 stated that CC-3 did not know the name or phone number of the female from whom CC-3 received the Box. Agent-1 observed that CC-3 appeared nervous, and was stuttering and failing to make eye contact with Agent-1 whenever CC-3 was asked about "Mike."

12. During the conversation with Agent-1, CC-3 also provided CC-3's business card to Agent-1, which bore the name "Jack" and CC-3's Phone Number.[2] CC-3 explained that CC-3's American name is "Jack." CC-3 subsequently consented to a search of Car-2.

13. Thereafter, Agent-1 recovered the Box from the Compartment, opened the Box, and observed that the Box contained multiple bundles of cash rubber-banded together, which, based on Agent-1's training and experience, were consistent with the packaging methods

---

[1] The investigation revealed that CC-1's government name is not "Mike"
[2] CC-3's government name is not "Jack."

of narcotics proceeds (i.e., the Defendant Currency). When asked about the Box's contents, CC-3 stated that CC-3 did not know that it contained cash and that the cash did not belong to CC-3.

14. Following Agent-1's recovery of the Defendant Currency, law enforcement used a New Jersey State Police Trooper canine to conduct a drug sniff of the Defendant Currency, and the canine provided a positive alert to the odor of narcotics on the Defendant Currency.

### III. FIRST CLAIM FOR FORFEITURE

15. Incorporated herein are the allegations contained in paragraphs one through fourteen of this Complaint.

16. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

17. Title 18, United States Code, Section 1956 provides in relevant part that:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)
> (i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part—
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

6

    (ii) to avoid a transaction reporting requirement under State or Federal law

violates the statute (18 U.S.C. § 1956(a)(1)(A), (B)).

  18. Title 18, United States Code, Section 1956(c)(7)(A) provides that "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title."

  19. Title 18 U.S.C. § 1961(1), which defines "racketeering activity," in turn provides that the definition encompasses "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

  20. The Defendant Currency is subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A), because there is probable cause to believe that the Defendant Currency represents funds derived from narcotics offenses and constitute property involved in illegal money laundering transactions in violation of 18 U.S.C. § 1956, and proceeds traceable to such violations.

  21. By reason of the above, the Defendant Currency became, and are, subject to forfeiture to the United States of America, pursuant to 18 U.S.C. § 981.

### IV. SECOND CLAIM FOR FORFEITURE

  22. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable

instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21].

23. The Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because there is probable cause to believe that they are proceeds traceable to exchanges of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Currency and that all persons having an interest in the Defendant Currency be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Currency to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
        July 2, 2018

                              GEOFFREY S. BERMAN
                              United States Attorney for
                              the Southern District of New York
                              Attorney for the Plaintiff
                              United States of America

By: _____
            KIERSTEN A. FLETCHER
            JONATHAN E. REBOLD
            Assistant United States Attorneys
            One St. Andrew' Plaza
            New York, New York 10007
            Tel. (212) 637-2238/2512

## VERIFICATION

| | |
|---|---|
| STATE OF NEW YORK | ) |
| COUNTY OF NEW YORK | : |
| SOUTHERN DISTRICT OF NEW YORK | ) |

SPECIAL AGENT MATTHEW RYAN, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information and the ground of his belief are conversations with other law enforcement officers and others, official records and files of DEA and the United States Government, and information obtained directly or indirectly by deponent during an investigation of alleged violations of Titles 18 and 21, United States Code.

_____
MATTHEW RYAN
Special Agent
Drug Enforcement Administration

Sworn to before me this
  day of June, 2018

_____
NOTARY PUBLIC

KEVIN C. GORMAN
Notary Public, State of New York
No. 02GO6161201
Qualified in WESTCHESTER County
Commission Expires FEBRUARY 20, 2015

9